# DECISIONS

OF THE

## SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

---

STOP THE OUTFALL PIPE, INC., & others[1] *vs.*
MASSACHUSETTS WATER RESOURCES AUTHORITY &
another.[2]

Suffolk. October 4, 1994. - November 17, 1994.

PRESENT: LIACOS, C.J., ABRAMS, LYNCH, & GREANEY, JJ.

*Massachusetts Water Resources Authority. Massachusetts Ocean Sanctuaries Act. Department of Environmental Management. Statute, Construction.*

The provisions of the Massachusetts Ocean Sanctuaries Act, G. L. c. 132A, §§ 12A-16F and § 18, as amended by St. 1989, c. 728, §§ 2-5, did not require the Massachusetts Water Resources Authority to obtain

---

[1]Additional plaintiffs include the towns of Barnstable, Dennis, Provincetown, and Wellfleet; Dolphin Fleet, Inc.; Portugese Princess, Inc.; South Shore Gillnetters Association; Massachusetts Lobsterman's Association; International Wildlife Association; Bays Legal Fund; thirteen residents of Essex County; fourteen residents of Barnstable County; and five ratepayers of the Massachusetts Water Resources Authority.

[2]The Department of Environmental Management.

a variance from the Department of Environmental Management for the construction and operation of a wastewater outfall tunnel, where the tunnel's discharge clearly was to occur outside the legislatively designated boundaries of any sanctuary. [10-14]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on January 27, 1994.

The case was reported by *O'Connor,* J.

*William B. Golden* (*Paul J. Niedzwiecki & Roy P. Giarrusso* with him) for the plaintiffs.

*Douglas H. Wilkins,* Assistant Attorney General, for the defendants.

GREANEY, J. The plaintiffs filed a complaint in the Supreme Judicial Court for Suffolk County pursuant to G. L. c. 132A, § 18 (1992 ed.), G. L. c. 231A, § 1 (1992 ed.), and G. L. c. 214, § 7A (1992 ed.), seeking declaratory and injunctive relief against the defendants, the Massachusetts Water Resources Authority (MWRA), and the Department of Environmental Management (department). The plaintiffs alleged in their complaint that both MWRA and the department have misinterpreted critical provisions of the Massachusetts Ocean Sanctuaries Act, G. L. c. 132A, §§ 12A-16F, and § 18, as amended by St. 1989, c. 728, §§ 2-5 (Act). The plaintiffs claim that the erroneous interpretation placed on the Act by MWRA and the department has resulted in a failure on the part of MWRA to apply for a variance under §§ 16-16F of the Act for the construction and operation of a wastewater outfall tunnel (tunnel), and that the department has failed to enforce the Act as it applies to MWRA. The parties filed a statement of agreed facts with a single justice of this court who allowed their joint motion to reserve and report the case, without decision, to the full court in order to answer the following question:

> "Must the Massachusetts Water Resources Authority obtain a variance under the Massachusetts Ocean Sanctuaries Act to construct and operate the outfall tunnel and discharge pipe which has its terminus outside the

boundaries of an ocean sanctuary, as described in the statement of agreed facts?"

We conclude that MWRA does not need to obtain a variance from the department under the Act in order to build and operate the tunnel, and consequently, answer the question, "no."

We first set out the facts and then summarize the pertinent provisions of the Act. The statement of agreed facts is as follows:

"1. In 1973 the Massachusetts Legislature enacted the Ocean Sanctuaries Act, M. G. L. c. 132, §§ 12A through 16 and 18 (the Act). The Act, as amended to the present time [by St. 1989, c. 728, §§ 2 through 5], creates five Ocean Sanctuaries . . . . The Act is administered by [the department].

"2. By a Special Act of the Legislature in 1984, [MWRA] was created and charged with planning, designing and constructing the facilities necessary to bring the sewer system for the Metropolitan Boston area into compliance with state and federal law (Boston Harbor Project).

"3. In 1991, Stop The Outfall Pipe, Inc. (STOP) was formed. Its members believe that municipal wastewater, treated at the Deer Island Treatment Plant (DITP), and discharged through the tunnel described below will have an adverse impact on Massachusetts and Cape Cod Bays, and the ocean sanctuaries which are a part thereof and assert that the tunnel is subject to the Act and [that] the MWRA is required by the Act to seek a variance from the prohibitions set forth therein.

"4. Since 1985 the MWRA has been subject to orders of the United States District Court for the District of Massachusetts to plan, design, and construct various sewage treatment facilities to bring the Metropolitan

Boston area's sewage system into compliance with the Clean Water Act, 33 U.S.C. § 1251, *et seq.* A central feature of this project is the outfall tunnel that is the subject of this case.

"A. *The Outfall Tunnel.*

"5. The MWRA has incorporated into the design of the treatment facilities on Deer Island and the Boston Harbor Project, an outfall tunnel (the tunnel) for the discharge of municipal wastewater, treated at DITP, from the City of Boston and 42 greater-metropolitan municipalities into Massachusetts Bay.

"6. The tunnel, with a diameter of 24 feet, will extend 9.5 miles into Massachusetts Bay. The last mile of the tunnel will be intersected by 55 vertical diffuser-riser pipes. Each diffuser pipe is about 30 inches in diameter and topped by a diffuser cap with eight nozzles to release the municipal wastewater, treated at DITP. Construction of various portions of the outfall and diffusers began in 1990 and 1991. When operable, the tunnel will discharge municipal wastewater, treated at DITP, into Massachusetts Bay at a depth of 100-120 feet below the ocean surface. . . .

"7. The tunnel was originally scheduled to be in operation by 1995 pursuant to the Federal Court order. The MWRA has informed the Federal Court that it will not be able to meet that milestone. In accordance with the present court order, a new treatment facility providing primary treatment will be in operation in 1995, replacing the currently operating plants, to be followed successively by four batteries of secondary treatment facilities, providing secondary treatment for an increasing percentage of the primary-treated municipal wastewater being discharged through the outfall tunnel. Battery A is scheduled to be completed in 1996; Battery B is scheduled to be completed in 1998; and Batteries C and

D are scheduled to be completed in 1999. The MWRA has informed the Federal Court that it is currently investigating the possibility that some part of Batteries C and D may not be necessary to bring the area sewage system into compliance with the Federal Clean Water Act. Any proposal not to build Batteries C, D or both would be subject to Federal Court approval. Depending on when the outfall is completed, it is possible that primary treated municipal wastewater will be discharged through the outfall tunnel for an interim period, as allowed in the Federal Court Schedule.

"8. On an average day, the tunnel will discharge 400 million gallons of municipal wastewater, treated at DITP, with a design capacity of 1.2 billion gallons. The combined daily flows of the Mystic, Charles and Neponset Rivers are approximately 522 million gallons of water.

"B. *The Outfall Location Relative to Massachusetts Ocean Sanctuaries.*

"9. The terminus of the tunnel is located approximately 2.77 nautical miles (3.19 statute miles) from the South Essex Ocean Sanctuary, approximately 5 and 6.5 nautical miles from Nahant and Marblehead, respectively, and approximately 25 nautical miles from the Cape Cod Bay Ocean Sanctuary. It is not located within boundaries of any ocean sanctuary. . . .

"10. When discharged from the outfall pipe, the treated municipal wastewater will be diluted by the surrounding sea water. At some level of dilution, however great or small, constituent materials from the discharge will enter the South Essex and Cape Cod Bay Ocean Sanctuaries, carried by winds, currents and other physical forces.

"C. *Permits.*

"11. The MWRA has various permits, approvals, certificates and other state and federal action or documentation (collectively, 'permits') to construct and operate the outfall tunnel. To date the following permits have been received for the outfall tunnel and diffusers:

| Agency | Date of Permit | Description of Permit |
|---|---|---|
| Mass. Exec. Off. Envir. Affairs | May 18, 1988 | Certificate of Compliance with Mass. Environmental Policy Act (MEPA), G. L. c. 30, § 61 et seq. |
| U.S. Environ. Protection Agency | Nov. 8, 1988 | Record of Decision approving Supplemental Federal Environmental Impact Statement (in cooperation with U.S. Army Corps of Engineers) |
| Boston Conservation Commission | March 29, 1990 | Wetlands Order of Conditions authorizing construction of outfall tunnel in tide waters (later renewed) (G. L. c. 131, § 40) |
| Mass. Dept. of Envir. Protection | April 6, 1990 and revised February 8, 1991 | Water Quality Certification for tunnel and diffusers (G. L. c. 21, § 43 and § 401 of the Federal Water Pollution Control Act) |

| Mass. Exec. Off Envir. Affairs | November 26, 1990 | Certificate that MWRA's Revised § 61 findings (G. L. c. 30 § 61) comply with MEPA. |
|---|---|---|
| U.S. Army Corps of Engineers | February 11, 1991 | Permit to construct, *inter alia*, outfall tunnel and diffusers |
| Mass. Dept. of Environ. Protection | October 23, 1991 | Waterways License (G. L. c. 91) for outfall shaft |
| National Marine Fisheries Service | September 8, 1993 | Biological Opinion under the Federal Endangered Species Act 50 CFR § 402.14(1)(1) |

"12. On September 13, 1991, the MWRA applied to the Massachusetts Department of Environmental Protection and the United States Environmental Protection Agency for a renewal of the jointly issued National Pollution Discharge Elimination System ('NPDES') permit to discharge municipal wastewater, treated at DITP, pursuant to the Federal Clean Water Act and the State Clean Waters Act (G. L. c. 21, §§ 25 *et seq.*). The application is pending before both agencies.

"D. *The Dispute.*

"13. [The department] has determined that the MWRA is not required to apply for a variance under the Ocean Sanctuaries Act because the MWRA's existing and proposed outfall tunnel and discharge are not located within any Ocean Sanctuary. Accordingly, MWRA has not applied for or received a variance. The plaintiffs contend that application of the Act and its variance is legally required because the MWRA's proposed outfall tunnel will discharge municipal waste-

water into the South Essex and Cape Cod Bay Ocean Sanctuaries."

We next describe the pertinent provisions of the Act and regulations of the department in implementation thereof. (The parties' dispute concerns the use of the words "in" and "into" throughout certain provisions. We have emphasized those words as they appear in each pertinent provision.) Section 13 of the Act creates five ocean sanctuaries by means of specific and detailed descriptions.[3] The only part of the Massachusetts coastline that is not within an ocean sanctuary is the area east of metropolitan Boston. To the north and east of the boundary between Lynn and Swampscott, the entire coastline and all State ocean waters, are within either the North Shore Ocean Sanctuary or the South Essex Ocean Sanctuary (north shore sanctuaries). To the south and east of a line between Brant Rock in Marshfield and Race Point in Provincetown (with a small exception which is not material to this case), all of the Massachusetts coastline and ocean waters are within the Cape Cod Bay Ocean Sanctuary

---

[3]For example, the South Essex Ocean Sanctuary, the sanctuary closest to the tunnel, is bounded and described in § 13 (*e*) of the Act as follows:

"Beginning at the mean low-water line at the southeastern-most point of Pickworth Point in the town of Manchester; thence by a line bearing (150 Degrees True)(South-southeasterly) seaward to a distance of three miles to a point (42 Degrees 31.13' north, 70 Degrees 43.87' west) thence due east (90 Degrees True) to the point of intersection (42 Degrees 31.13' north, 70 Degrees 36.70' west) with the Exterior Line of the Boundary of the Commonwealth as established on the aforementioned Marine Boundary Map; thence southerly along said Exterior Line to a point (42 Degrees 26.10' north, 70 Degrees 38.42' west) thence due west (270 Degrees True) along a line a point (42 Degrees 26.10' north, 70 Degrees 52.02' west) which is three miles from the mean low-water line on a line which is the extension of the boundary line between the city of Lynn and the town of Swampscott thence northwesterly along said boundary extension to the mean low-water line; thence easterly, northeasterly, northwesterly, southwesterly, northeasterly, northwesterly, and northeasterly along the line of mean low-water of the commonwealth to the point or place of beginning; and meaning and intending to include Marblehead Harbor, Salem Harbor, Beverly Harbor, Salem Sound, Manchester Bay, and parts of Massachusetts Bay."

or the Cape and Island Ocean Sanctuary (south shore sanctuaries).

Section 14 of the Act places "[a]ll ocean sanctuaries . . . under the care, oversight and control of the department," which is to protect the sanctuaries from "any exploitation, development, or activity that would significantly alter or otherwise endanger the ecology or the appearance of the ocean, the seabed, or subsoil thereof, or the Cape Cod National Seashore." The department has interpreted this language as directing it to "act as a trustee of the resources of the ocean sanctuaries rather than as a permitting agency for specific activities." 302 Code Mass. Regs. § 5.09(1) (1993).

Section 15 of the Act sets forth prohibited activities by stating, in pertinent part, that "[e]xcept as otherwise provided herein [there] shall be prohibited *in* an ocean sanctuary . . . the dumping or discharge of commercial, municipal, domestic or industrial wastes . . ." (emphasis added). The department has implemented this prohibition by a general ban on any "municipal . . . discharge . . . occurring in any ocean sanctuary" after the effective date of the Act with certain enumerated exceptions. 302 Code Mass. Regs. § 5.08(2).

Section 16 of the Act, in pertinent part, provides for permitted activities in ocean sanctuaries in three ways. First, "[*i*]*n* all ocean sanctuaries except the Cape Cod Sanctuary . . . the operation and maintenance of existing municipal, commercial or industrial facilities and discharges [are permitted] where such discharges or facilities have been approved and licensed by appropriate federal and state agencies . . . ." (Emphasis added). Second, new municipal wastewater treatment discharges "*into*" the north shore sanctuaries are permitted "if such discharge *into* the ocean sanctuary is the only feasible alternative to existing water pollution problems[,] if it is consistent with the intention and purposes of this chapter, and it is approved and licensed by appropriate federal and state agencies." (Emphasis added). Third, "[i]n the North Shore Ocean Sanctuary" certain municipal

.

wastewater discharges are grandfathered, if they meet specified criteria.

Section 16A of the Act provides, in pertinent part, that, in other cases, the prohibition in § 15 against "discharges of municipal wastes *into* the ocean sanctuaries" will not further the purposes of the Act, that prohibition will not be applied if "a suitable quality of effluent is achieved to protect the appearance, ecology, and marine resources of the sanctuary," and the department "in its discretion, upon application, grants a variance from the prohibitions of . . . [§] 15" (emphasis added). A variance may be granted only when an applicant satisfies a lengthy list of procedural and substantive requirements set forth in §§ 16B-16F of the Act, as further implemented by department regulations entitled "Variance for Discharge into an Ocean Sanctuary," 302 Code Mass. Regs. § 5.10 (1993).

Finally, § 18 of the Act provides, in pertinent part, that all State agencies and departments are required to "issue permits or licenses for activities or conduct their activities consistently with the act." Section 18 also states that, except for the Act's variance procedure, the department "shall not require any additional permits." Consistent with its view of this provision, the department has limited itself to examining the permitting procedures of other State agencies and departments "insofar as they relate to the ocean sanctuaries." 302 Code Mass. Regs. § 5.09(2).

We turn now to resolution of the dispute. As has been earlier stated, the plaintiffs allege that MWRA and the department have erroneously interpreted the Act to allow the tunnel to proceed without the need for a variance. The plaintiffs contend that the Legislature's use of the words "in" and "into" in §§ 15, 16, and 16A of the Act is purposeful and is intended to prohibit both discharges of treated municipal wastewater within the actual boundaries of an ocean sanctuary ("in") and discharges outside of those boundaries which, through the effects of natural forces, might migrate "into" a sanctuary. The core of the plaintiffs' argument is expressed in their brief as follows. "Encompassing its unique nature in

relation to the other prohibitions, the [L]egislature clearly recognized that the Act and its variance procedure could be applied not only to municipal wastewater discharges located within the boundaries of an ocean sanctuary, but also to a municipal wastewater discharge not located with[in] the boundaries of an ocean sanctuary where that discharge enters the sanctuary, penetrates the sanctuary, or passes from outside to the inside of the sanctuary" (footnote omitted). Based on the facts contained in the tenth paragraph of the statement of agreed facts, which indicate that treated municipal wastewater from the tunnel will be diluted by the surrounding sea water and, at some level of dilution, "great or small," constituent materials from the discharge will enter the South Essex and Cape Cod Bay Ocean sanctuaries, carried by winds, currents and other physical forces, the plaintiffs conclude that the tunnel falls within the prohibition of the Act, and before it can be completed or operated, a variance must be sought by MWRA and obtained from the department in accordance with the requirements of §§ 16A-16F of the Act. We disagree.

We examine the Act under the general rule that "a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975). "[T]he statutory language itself is the principal source of insight into the legislative purpose." *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977).

We believe that the prepositions "in" and "into" are used in the Act synonymously to prohibit discharges of municipal wastewater that actually occur within the boundaries of an ocean sanctuary. Section 15 sets out a broad general prohibition against such discharges by use of the word "in." Section

16 permits such discharges in certain areas and circumstances using both the word "in" and the word "into," while § 16A imposes a variance procedure for such discharges in exceptional circumstances using the word "into." That the prepositions are meant to be interchangeable, can especially be seen by comparing § 15 (which sets out a prohibition against enumerated activities, including discharges of municipal wastewater "*in* an ocean sanctuary"), with § 16A (which begins its provision governing the need for a variance by referring to "cases where the prohibition in section fifteen against discharges of municipal waters *into* the ocean sanctuaries may not further the purposes of the act").

In this case, the tunnel's discharge will clearly occur outside of the boundaries of any sanctuary. The terminus of the tunnel is located approximately 2.77 nautical miles from the South Essex Ocean Sanctuary and approximately twenty-five nautical miles from the Cape Cod Bay Ocean Sanctuary, and the treated wastewater will be discharged through a system of diffusers in (and into) nonsanctuary waters east of metropolitan Boston. We do not think the Legislature intended that the tunnel's discharge would be considered one within an ocean sanctuary simply because, after the discharge is diluted by ocean water, some of the constituent particles will be carried by wind, tides and other natural forces and end up, at some level of dilution, "however great or small" inside the boundaries of an ocean sanctuary.[4]

This conclusion is also supported by the Act's structure. The Legislature intended to establish a sanctuary program by way of sanctuaries with specific geographic boundaries. The Legislature did so by creating five geographically de-

---

[4]The plaintiffs suggest that "it would be possible to build the largest municipal wastewater tunnel in the world and allow it to discharge within inches of the MWRA's arbitrary and capricious line." Such a hypothetical raises entirely different issues from the present case, where several miles separate the point of discharge from the sanctuaries. The case imagined by the plaintiffs well might raise the possibility of a deliberate avoidance of the Act's provisions, and might require a different conclusion as to whether such a discharge was subject to the variance procedure.

fined sanctuaries on the north and south shores, leaving only the area east of metropolitan Boston outside of any sanctuary. By the time the Act underwent substantial amendment by St. 1989, c. 728, §§ 2-5, to establish, among other things, the variance procedure for certain municipal wastewater discharges, the Legislature undoubtedly knew that efforts had been on-going for eighteen years to clean up Boston Harbor. See *United States* v. *Metropolitan Dist. Comm'n,* 930 F.2d 132, 137-139 (1st Cir. 1991) (describing the lengthy history of the Boston Harbor clean-up project). See also *United States* v. *Metropolitan Dist. Comm'n,* 865 F.2d 2, 4 (1st Cir. 1989) (describing the location of the tunnel and proceedings concerning its siting). We think the Legislature would have understood, and intended, that the Boston Harbor clean-up project would involve discharge of treated municipal wastewater into the only waters excluded from sanctuary status somewhere in the area where the MWRA is now constructing the tunnel. In this respect, the Legislature appears to have acted purposely in § 18 of the Act to limit the department's permitting and licensing authority, in cases where a variance is not required, by relying upon other Federal and State agencies and departments to regulate activities taking place outside of ocean sanctuaries. Indeed, the statement of agreed facts demonstrates precisely this kind of monitoring through considerable and vigorous Federal and State oversight of the tunnel and its effects upon water quality, tidelands, endangered species, aquatic life and numerous other natural resources.

The defendants have offered other reasons to support their interpretation of the Act. We need not discuss them because the result seems to us to be clear based on the language of the Act, and the balance which the Legislature sought to strike between protecting ocean sanctuaries and providing for the clean-up of Boston Harbor through MWRA's operation of the Deer Island Treatment Plant and the tunnel. The reported question is, therefore, answered "no," and the case is remanded to the county court for the entry of a suitable dec-

laration that the tunnel does not require MWRA to seek a variance from the department under the Act.

*So ordered.*