SUPERIOR COURT 
 
 COMMONWEALTH OF MASSACHUSETTS v. JUSTICE M. SKELTON

 
 Docket:
 2284CR438
 
 
 Dates:
 May 16, 2024
 
 
 Present:
 William F. Bloomer Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE UNDER LONG (Paper No. 33) AND SUPPLEMENTAL MOTION TO SUPPRESS (Paper No. 34)
 
 

             The defendant, Justice M. Skelton ("Skelton"), moves to suppress fentanyl and cocaine seized from his vehicle on August 24, 2021, following a stop based upon violations of motor vehicle laws. Skelton alleges violations of his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and arts. 1 and 10 of the Massachusetts Declaration of Rights (Paper No. 33). Skelton further seeks suppression of all evidence under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and arts. l , l 0, 12, and 14 of the Massachusetts Declaration of Rights (Paper No. 34).
            After careful consideration of the evidence and relevant legal standards, the defendant's motions to suppress are hereby DENIED.
BACKGROUND
            On October 24, 2023, the court (Ellis, J.) determined that the defendant had met his initial burden under Commonwealth v. Long, 485 Mass. 711 (2020). Judge Ellis concluded, after an evidentiary hearing, "based on the statistical evidence presented, and the police report's silence about whether the officers initially observed the driver, the defendant has made a threshold showing of discriminatory enforcement as to the initiation of the stop sufficient to warrant a
 
                                                            -1-
 
further evidentiary hearing." See Paper No. 40. The matter is now before this court to determine whether the Commonwealth has successfully rebutted the inference that race played some part in the officers' decision to stop the defendant.
            The court conducted an evidentiary hearing on January 22 and April 29, 2024. The court heard testimony from a statistician, Mr. Roland Bradley Stark, and Boston Police Department ("BPD") Officers Christopher Holt ("Holt"), Raymond Soto ("Soto"), and Brian Stallings ("Stallings"). The court also received twenty-nine (29) exhibits in evidence. Skelton did not testify. The court makes the following factual findings based on the credible evidence produced at the hearing and the reasonable inferences drawn from the evidence. In making these findings, the court finds the testimony of Holt, Soto, and Stallings truthful and accurate on the relevant and material points set forth below. The court addresses the testimony of Stark separately.
FINDINGS OF FACT
            In August 2021, Stallings, Holt, BPD Officer Joseph Starkey ("Starkey"), and Massachusetts State Trooper Edward Alldredge ("Alldredge") were assigned to the BPD Youth Violence Strike Force ("YVSF"). The primary mission of the YVSF is to prevent and reduce firearm- and/or gang-related violence. To further that mission, members of the YVSF patrol high-crime areas within the City of Boston where a recent uptick in crimes involving firearms has occurred.
            Stallings has been a member of the BPD for approximately ten years. For the last three years, Stallings has been assigned to the YVSF. Prior to that assignment, Stallings worked the midnight to 7:00AM shift in District B-2, covering Roxbury, for six years. Holt has been an officer on the BPD for a total of eighteen years, the last eight of which he has served as a member of the YVSF. Prior to that assignment, Holt spent ten years on patrol in District 4,
 
                                                            -2-
 
which includes the South End. Soto has been employed by the BPD for approximately six years. He is currently assigned to the Dorchester Drug Control Unit. Soto previously worked as a BPD officer assigned to Jamaica Plain, Roxbury, and Brighton. At the time of the stop of the defendant in August 2021, Soto was a member of the area B-2 Anti-Crime Unit, which patrolled Roxbury.
            On August 24, 2021, the YVSF officers involved in this case - Stallings, Starkey, Holt and Alldredge - worked the 4:00PM to midnight shift. Starkey, Stallings, and Alldredge were together in one unmarked police vehicle. Stallings drove, Starkey was the front seat passenger, and Alldredge was in the rear passenger compartment. Holt drove alone in a separate unmarked police SUV. At approximately 5:00PM, the offers were in the area of Massachusetts Avenue and Melnea Cass Boulevard, known as " Mass and Cass," which, at the time, was frequented by individuals actively using illicit drugs in public.
            At approximately 5:39PM, while traveling on Massachusetts Avenue in Roxbury, Starkey, Stallings, and Alldredge observed a grey Chevrolet Malibu ("Chevy") with excessively tinted passenger side windows traveling on Theodore Glynn Way towards Southampton Street. A window tint below 35 percent is illegal. Stallings estimated the visible light transmittance of the Chevy's side windows to be 5 percent. Officers were approximately 70 to 100 feet away from the Chevy when they first observed it, but Stallings noted it was "very apparent" the window tint was excessive. As Stallings turned right onto Theodore Glynn Way, the Chevy accelerated at a high rate of speed, taking a left onto Southampton Street. Stallings caught up to the Chevy as it turned into the lot of a Mobil gas station. At some point after turning onto Theodore Glynn Way but before arriving at the Mobil gas station, Stallings activated the emergency lights and siren on the unmarked police cruiser. Due to the excessive window tint,
 
                                                            -3-
 
Stallings could not see into the Chevy at the time he initiated the stop. He could neither see the driver nor could he determine how many occupants were in the vehicle. The operator of the Chevy initially pulled up to a gas pump but sped away from the area towards Massachusetts Avenue when officers arrived. The vehicle turned right onto Pompei Street, a one-way, heading in the wrong direction. Starkey broadcast the vehicle's description over the radio. See Exhibit ("Ex.") 7 (radio transmissions). Starkey further broadcast that "failure to stop" for a police vehicle was the reason why pursuing officers wanted the car stopped. The Chevy continued traveling at a high rate of speed onto Allerton Street and then Magazine Street. At that point, Stallings lost sight of the Chevy. He disengaged pursuit due to safety concerns.
            Holt, meanwhile, was driving along Dudley Street when he overheard Starkey's radio broadcast that Stallings, Starkey, and Alldredge were attempting to conduct a motor vehicle stop. Starkey broadcast over the radio that "Victor K 1O," the call sign for their YVSf unit that evening, was attempting to stop a "silver Chevy" on Massachusetts Avenue. No information about the appearance of the operator of the Chevy was included in Starkey ' s initial radio transmission.
            After hearing the radio broadcast, Holt changed direction and drove to the area where officers were attempting to stop the Chevy. Holt proceeded down Norfolk Avenue in his assigned police vehicle. Holt then overheard a radio broadcast indicating that the fleeing vehicle was on Magazine Street, which was a short distance from Holt's location. As he approached the intersection of Norfolk and Magazine Streets, Holt almost "T-boned" the Chevy, unsure how he avoided hitting the vehicle. At that time, Holt observed the operator of the Chevy through the vehicle's front windshield.  Holt again changed directions and followed the Chevy as it proceeded to travel down Dudley Street toward Blue Hill Avenue.
 
                                                            -4-
 
            Around that time, Starkey broadcast the vehicle, "was on Blue, headed up towards Grove Hall." The Chevy then made a left turn onto Huckins Street and another left onto Dennis Street, driving toward Dudley Street, when Holt momentarily lost sight of the vehicle. Holt last saw the Chevy heading down Dudley Street and turning onto Langdon Street, another one-way street, driving in the wrong direction. Holt abandoned pursuit at that time and remained in the area in his police vehicle. The supervisor that evening directed all officers over the radio to end pursuit due to the basis for initiating the stop, that is, violations of the automobile laws. YVSF officers confirmed termination of their efforts to stop the Chevy.
            Meanwhile, Soto was stationed at a fixed post in full uniform and assigned to patrol the general area where events were unfolding. Soto observed the Chevy traveling on Norfolk Street and turning onto Peirson Street at a high rate of speed. Soto also noticed the vehicle had heavily tinted windows. The Chevy came to a stop, and Soto observed a male walk away from the vehicle carrying a "fanny" or shoulder pack. When Soto pulled up next to this individual in his cruiser, the male immediately jumped a " pretty high" fence that had barbed wire atop it. See Ex. 16. Soto noticed that the male's fanny pack got caught on the barbed wire, requiring the male to use the upper portion of the fence to leverage himself up and over the fence, eventually dislodging the bag. Soto attempted to scale the fence but cut himself on the barbed wire and elected not to pursue the male further. Soto observed the male running towards Pompei Street. He broadcast his observations over the radio, including a description of the fleeing male.
            Holt heard the description, which matched the description of the person driving the Chevy. Holt broadcast "that was the operator." Soto further described the person as a Black male with a thin build and wearing a white t-shirt, who might have something in his hand. Holt then proceeded to drive to the area of Peirson Street.
 
                                                            -5-
 
            Around this time, Starkey queried over the radio whether anyone had a description of the operator. Soto responded over the radio that the operator had brown skin and "small dreads" and wore a white t-shirt. The description was then rebroadcast in greater detail as an approximately 5-foot, 8-inch-tall I3lack male with " little dreads" wearing regular jeans and a white t-shirt, who might be "cut up" because he hopped a barbed wire fence. Radio transmissions further indicated that this male might be in a yard on Pompei Street; however, within minutes, a transmission referenced the male having been seen on a balcony to a building on Chesterton Street. Officers next tracked the male running into an apartment at 10 Chesterton Street. A resident of that apartment, who was awoken from a nap, informed officers that a male had offered them money to hide him in their home, but they refused. Stallings heard someone moving about in the basement of the building. He and other officers then cleared the basement. From there, they exited the building to the backyard, where Skelton was located hiding beneath a set of stairs.
            By that time, multiple police units had responded to the scene. Holt proceeded to the location. When Holt arrived at the location, Stallings and other YVSF officers had already detained Skelton. Holt identified Skelton "100%" as the operator of the Chevy.
            After the arrest of the defendant, officers returned to the Chevy, which was parked on a public way. Although not the first officer to arrive at the car, Soto nonetheless observed a bag containing what appeared to be crack cocaine in plain view on the driver's seat.[1] A detective photographed the exterior and interior of Chevy. A photograph of the interior of the car shows a knotted clear plastic bag containing a white substance plainly visible on the driver's seat. Sec Ex. 26. Another photograph depicts clear plastic sandwich bags containing a white substance on the passenger's side floor. See Ex. 27. The photographs also depict the Chevy's heavily
 
--------------------------------------------
 
[1] A loaded firearm and magazine were discovered along the defendant's flight path, but Skelton has not been charged in connection with those discoveries. The court, therefore, docs not address the seizure of tho se item s.
 
                                                            -6-
 
darkened tint on the driver's side and passenger's side windows as well as tint on the rear window. See Exs. 12 - 25. The license plate is not attached to the front of the car; rather, it is situated on the dashboard. See Ex. 13.
            Additional factual findings are integrated in the following rulings of law.
RULINGS OF LAW
            "[T]he federal and State constitutional guarantees of equal protection of the laws provide residents of the Commonwealth a degree of protection separate and distinct from the prohibition against unreasonable searches and seizures [sic] under the fourth Amendment and art. 14 (citation omitted) ... [however], there may be substantial overlap between an inquiry into the reasonableness of a stop and the officers motivation for stopping a suspect." Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 22-23 (2023). The defendant's challenges arc addressed seriatim below.
A.        EQUAL PROTECTION CLAIM
            It is well settled that "[t]he equal protection principles of the fourteenth Amendment ... and arts. I and IO ... prohibit discriminatory application of impartial laws." Commonwealth v. Lora, 451 Mass. 425, 436 (2008). "A defendant seeking to suppress evidence based on a claim that a traffic stop violated principles of equal protection bears the burden of establishing, by motion, a reasonable inference that the officer's decision to initiate the stop was motivated by race or another protected class." Long, 485 Mass. at 713. "If this inference is established, the defendant is entitled to a hearing at which the Commonwealth would have the burden of rebutting the inference. Absent a successful rebuttal, any evidence derived from the stop would be suppressed." Id.
 
                                                            -7-
 
            "To meet its burden, the Commonwealth would have to do more than merely point to the validity of the traffic violation that was the asserted reason for the stop. Rather, it would have to grapple with all of the reasonable inferences and all of the evidence that a defendant presented, and would have to prove that the stop was not racially motivated." Long, 485 Mass. at 726. See Commonwealth v. Stroman, I 03 Mass. App. Ct. 122, 122-123 (2023) (at evidentiary hearing, Commonwealth bears burden of proving stop not racially motivated). " If the Commonwealth does not rebut the reasonable inference that the stop was motivated at least in part by race, the defendant would have established that the stop violated the equal protection principles of arts. 1 and 10, and therefore was illegal, and any evidence derived from the stop would have to be suppressed." Long, 485 Mass. at 726, citing Lora, 451 Mass. at 438.
            In examining a claim of unconstitutional selective enforcement of the traffic laws, "a reviewing judge must consider the totality of the circumstances surrounding the claim." Robinson-Van Rader, 492 Mass. at 20. As the SJC stated in Long,
When examining the totality of the circumstances, judges should consider factors such as (1) patterns in enforcement actions by the particular police officer; (2) the regular duties of the officer involved in the stop; (3) the sequence of events prior to the stop; (4) the manner of the stop; (5) the safety interests in enforcing the motor vehicle violation; and (6) the specific police department's policies and procedures regarding traffic stops. These factors are not exhaustive; any relevant facts may be raised for the judge's consideration.
485 Mass. at 724-725. A reviewing judge should consider the relevant Long factors in determining whether the Commonwealth has successfully rebutted the inference that the stop of the defendant was motivated in part by race. See Stroman, I 03 Mass. App. Ct. at 127.
 
                                                            -8-
 
            (1) Patterns of Enforcement Actions by Stallings and Starkey
            In meeting his initial burden under Long, Skelton focused primarily on the first factor of the totality of the circumstances test, relying on a statistical analysis of the "patterns of enforcement actions" by BPD Officers Starkey and Stallings. In Long, the SJC noted,
There generally are two components to the statistical data that defendants have used to establish a reasonable inference that the decision to conduct the traffic stop was motivated by race: (I) information about how the statute was enforced against other drivers of the defendant's race by the officers or department in question, often involving numbers of stops, citations, and FIOs for drivers of specific races (enforcement data); and (2) statistical data that estimate the demographic distribution of drivers on the roads in the area of the stop (benchmark data). The two are then compared , under the assumption that, absent impermissible discrimination, the enforcement rates should reflect the demographic composition of all drivers.
485 Mass. at 731, citing Lora , 45l Mass. at 442.
            In seek ing to rebut the inference that race played some role in the officers' decision to stop Skelton, the Commonwealth challenges the methodology developed and employed by a statistician retained by the defense, Mr. Roland B. Stark ("Mr. Stark"). Mr. Stark analyze d data associated with Starkey and Stallings's field Interrogation and Observation ("FIO") reports.
The Commonwealth called Mr. Stark over the defendant's objection as a witness at the hearing.[2] Mr. Stark is a self-employed statistician who engages in statistical research and consulting. Prior to 2022, Mr. Stark focused primarily in building statistical tools and assisting in statistical analyses in the healthcare field. Mr. Stark did not recall reading the reports related to the stop of the defendant in this case; rather, he took direction from counsel as to which officers' histories to analyze.
 
--------------------------------------------
 
[2] Neither the defendant nor the Commonwealth introduced evidence related to Mr. Stark's education and training in statistical analysis.
 
                                                            -9-
 
            In performing his analysis in the present case, Mr. Stark chiefly compared the racial mix of Stallings and Starkey' s past FIO "stops" (enforcement data) to the racial mix of the population the officers would encounter on the roadways during their patrols in Roxbury (benchmark data). He obtained data related to these two officers from two independent sources: the Department of Transportation ("DOT") and the "Analyze Boston Website" ("ABW"). Mr. Stark testified the DOT database contained information related to twenty-eight stops by one officer and one stop for another. According to Mr. Stark, the DOT database contained very little information about the stops themselves. He acknowledged the information amassed in the ABW accounted for
most of the data he examined. Mr. Stark analyzed 254 FIO reports of Stallings and Starkey over primarily a two-year period (from July 2017 through July 2019).[3]
            Mr. Stark "assembled and cleaned up" the data from the ABW. He explained the ABW data came in two files per year: one related to the "stop" and one related to the "person" or persons involved in the stop. Mr. Stark took the information related to each stop, including where, when, and what time these stops occurred, and merged it with the information related to the person or persons involved in each stop, including the race and age of the person. This was accomplished primarily by marrying the unique number assigned to each FIO report.[4]
            Mr. Stark combined the data for Stallings and Starkey together for analysis. He did not analyze the data for Trooper Alldredge, who was involved in the initiation of the stop of the defendant because, in his view, the data were small in number (42 events), the nature of the data
 
--------------------------------------------
 
[3] While Mr. Stark examined 254 "stops" between January 2017 and July 2021, approximately 89 percent of Stallings and Starkey's stops took place between 2017 and 2019.
[4] It is unclear from Mr. Stark's testimony whether traffic citations issued by Stallings and Starkey were included in the Al3W and accounted for in Mr. Stark's analysis. His report, Ex. 28, references 403 citations associated with distinct field contact numbers. Thus, he deduces, many FIO reports included data on an additional person and/or offense. When multiple persons of different races were involved in one "stop," Mr. Stark used a code to choose one person at random to designate the race associated with the stop as a whole.
 
                                                            -10-
 
was not comparable to the data available for the BPD officers, and Trooper Alldredge had patrolled different areas than the BPD officers. Although Mr. Stark could not recall what Trooper Alldredge did in this case, he nevertheless believed it would not have been a "productive exercise" to include Trooper Alldredge's data in his analysis.
            After merging the "stop" and " person" files together, Mr. Stark analyzed the combined enforcement data for Stallings and Starkey. He determined that, of the 254 FIOs documented, 209 involved motor vehicle stops and the remainder involved stops of pedestrians. See Exs. 2-3 (FIO reports of Officers Starkey and Stallings). Mr. Stark based his analysis on whether the FIO report itself labeled the interaction between the officer and a member of the public as a "s top," which, he clarified, amounted to 245 of the 254 FIO reports.[5] He did not read or consider the narratives of any of the FIO reports. In fact, the basis of the stop played no role in Mr. Stark's analysis. Instead, Mr. Stark examined other data, such as the race of the person stopped, the duration of the stop, and whether it was based on probable cause or some lesser basis, if such information was available. Mr. Stark created an excel spreadsheet to capture the data in this case. See Ex. 1. Based on his analysis, Mr. Stark concluded that approximately 88.6 percent of
 
--------------------------------------------
 
[5] Mr. Stark agreed that FIOs can involve simple observations or chance encounters with individuals. In its Supplemental Memorandum, the Commonwealth identifies several FIO reports that capture casual conversations or observations of Stallings and Starkey, as opposed to "stops" of pedestrians or motorists. See Comm. Supp. Memo at *5. Evidently, Mr. Stark did not exclude such FIO reports from his reported analysis and findings. In addition, Stallings explained that he does not write an FIO report to document each observation he makes or each interaction he has with a member of the public, which would be impractical. Rather, Stallings generally documents FIOs when responding to radio dispatches or for intelligence gathering purposes, such as when a particular individual behaves aggressively towards him or other officers, so as to alert other police officers to a potential safety concern should they encounter that person, or when he observes known gang members associating with other known gang members. Stallings testified about the details related to approximately one dozen FIO reports out of more than one hundred to illustrate this point. In other words, Stallings had a reason independent from the race of the person stopped to conduct a FIO. Mr. Stark, however, did not consider the reason for the FIO.
 
                                                            -11-
 
the individuals stopped by Stallings and Starkey primarily over a two-year period were African American. [6]
            After determining the enforcement data associated with Starkey and Stallings, Mr. Stark sought to determine the racial or demographic make-up of the driving population where the officers were conducting their patrols, including the people who resided there and others who did not reside in the patrol area but would be driving through Roxbury from outside the community. To determine the racial composition of the driving population, Mr. Stark included drivers from "feeder communities" which he selected. Table I of Mr. Stark's report lists thirty-one (31) communities that he considered. It also lists the percentage of residents who arc Black within those communities. To arrive at the percentage of Black residents in Boston and specific feeder communities outside Boston, Mr. Stark considered data from "Boston city sources, the United States Census, and some other journalistic or resource sources of information about locations, including Boston neighborhoods [and) other municipalities."
            Mr. Stark then ranked the communities in terms of " the degree of influence" that he believed each community might have on the driving population in Roxbury. Mr. Stark used two primary reference points to identify what he believed constituted a "feeder community" into Roxbury: (1) the community' s distance from Roxbury and (2) the ease of access to Roxbury via roadways. His calculations led him to conclude that a combination of Roxbury and feeder communities would produce "a percentage in the 30s or 40s" of drivers on the roads of Roxbury who were African American, with a possible upper limit of approximately 50 percent. Mr. Stark found this benchmark data to be statistically disparate from the enforcement data showing 88.6
 
--------------------------------------------
 
[6] Mr. Stark uses the terminology African American and Black interchangeably in his report and testimony. The court uses the same terms in the interest of consistency.
 
                                                            -12-
 
percent of the individuals stopped by Starkey and Stallings were Black and not something that would arise by chance.
            The court has concerns, however, regarding the reliability of the methodology employed by Mr. Stark in arriving at the enforcement datapoint of 88.6 percent and the benchmark data of "a percentage in the 30s or 40s." First, Mr. Stark did not consider in any meaningful way whether the stops reflected in the FIO reports were discretionary or nondiscretionary. Second, the methodology Mr. Stark employed in arriving at an estimated driving population for Roxbury is subjective, speculative, and as Mr. Stark conceded, difficult to replicate.
            Discretionary v. Nondiscretionary FIO Stops. Mr. Stark characterized "discretionary" as a "slippery term," believing there is no bright line distinction between discretionary and nondiscretionary stops.[7] Mr. Stark acknowledged the need for a systematic approach to determine whether a stop was discretionary or nondiscretionary. If he were to engage in an exercise to convert such "qualitative" data into "quantitative" data, Mr. Stark would first ask for guidance in distinguishing between what was a discretionary stop and what was a nondiscretionary stop and then follow "some kind of systematic procedure rather than trusting my own nonpolice person's knowledge of what is discretionary."[8] That was not done here. The court (Ellis, J.) previously rejected Mr. Stark's methodology in an unrelated case for failing to understand the " fundamental aspects of what constitutes a discretionary stop." Sec Ex. 5, Commonwealth v. Shaldon Pascal, Docket No. 2284CR00I 14, at *14 (Ellis, J.) (Dec. 22, 2023)
 
--------------------------------------------
 
[7] For example, Mr. Stark had difficulty categorizing a stop based on a "Be On The Lookout" (" BOLO") report as "discretionary" or "nondiscretionary" without some type of systematic approach. See e.g., Exhibit 3, FIOE # I70025897. He also had difficulty categorizing a traffic stop for revoked insurance or a response to a repm1 of someone trespassing in a basement as discretionary or nondiscretionary.
[8] A review of Stallings and Starkey's FIO reports reveals numerous nondiscretionary "stops," including those involving responses to 91 I calls and repo11s of, among other things, shots fired, physical altercations, and incidents of domestic violence.
 
                                                            -13-
 
(emphasis in original). The inclusion of nondiscretionary stops of African Americans by Stallings and Starkey in Mr. Stark's analysis similarly erodes this court's confidence in Mr. Stark's statistical analysis.
            Defense counsel appropriately addressed this issue, however, at the hearing. During counsel's cross-examination of Mr. Stark, it was revealed that the Commonwealth challenged the inclusion of 82 FIO stops in Mr. Stark's calculated enforcement data as nondiscretionary in nature. Mr. Stark testified that , even assuming all 82 challenges involved African Americans, and further excluding those stops from his analysis, it would reduce the percentage of African Americans stopped by Stallings and Starkey to approximately 83 percent - still a significant difference from the benchmark data in the 30 or 40 percentiles he calculated, assuming Mr.
Stark's estimated driving population is correct.[9]
            Driving Population Estimate. Mr. Stark did not follow an established method to estimate the driving population of the area of Roxbury patrolled by the officers; rather, Mr. Stark chose certain feeder communities based on his personal experience as a resident of Eastern Massachusetts - though not of Roxbury or Boston in general - and by examining maps. He acknowledged there are studies addressing how to construct driving populations, but he did not follow any of their directives because he did not believe them to be the correct or approved way to go about it. To determine the racial composition of the driving population in Roxbury, Mr. Stark admittedly had to engage in some "educated guesswork." He conceded he could have done more to quantify the feeder communities, and that it was "anybody 's call on how thorough" his benchmarking analysis was, but that the discrepancy in percentages in terms of race between the Roxbury driving population and the individuals stopped by Stallings and Starkey was so great
 
--------------------------------------------
 
[9] It is unclear whether the 83 percent figure is calculated from the 254 FIO reports or 245 reports.
 
                                                            -14-
 
further analysis was unnecessary. Two judges of this court have rejected the reliability of Mr. Stark's methodology for deriving a driving population estimate. See Ex. 6, Commonwealth v. Arsenio Andrade, Docket No. 1983CR00156, at *7 (Kirpalani, J.) (Dec. 16, 2022); Ex. 5 Pascal, supra, at *18. This court similarly finds the educated guesswork engaged in by Mr. Stark to arrive at the estimated percentage of Black drivers on the roads of Roxbury imprecise, speculative, and difficult to replicate.[10]
            Ultimately, this court finds Mr. Stark's methodology in arriving at the estimated racial composition of the driving population for Roxbury to  be unscientific  and  unreliable.  See  Lora, 451 Mass. at 440, citing Chavez v. Illinois State Police, 251 F.3d 612, 637-640 (7th Cir. 2001) (if evidence is introduced through expert testimony, "expert analysis must be both relevant and reliable."); Commonwealth v. Lanigan, 419 Mass. 5, 26 (194) ("[i]f the process or the theory underlying [an] ... expert's opinion lacks reliability, that opinion  should  not  reach  the  trier of fact"); Commonwealth v. Davis, 487 Mass. 448, 453 (2021)  (proponent  of  expert  opinion evidence must establish sufficient foundation for judge to determine whether expert's opinion
 
--------------------------------------------
 
[10] Of less significance, but still a consideration, is the time and the relevant roadways of the FIO stops. After preparing his report, Mr. Stark "wondered whether the time of day might affect the degree to which feeder locations would be sending especially cars into the area," so that the mix of residents of Roxbury and non-residents of Roxbury might be slightly or moderately (or significantly) different, depending on the time of day. He opined, without any basis of knowledge that the court can discern, that there was no "crucial difference" in the number of nonresidents driving in Roxbury at noon as compared to midnight, or 5:00AM as compared to 5:00PM. See Ex. 5, Pascal, supra, at* 17 (noting failure of Mr. Stark to consider overwhelming number of FIO stops occurred in evening and early morning hours when commuters arc not populating community roadways).
Having patrolled Roxbury during a midnight to 7:00AM shift for six years, Stallings knew District 8-2 to have a minority-majority, predominantly African American, residential population. Stallings described certain sections of Roxbury, such as the area around Humbolt Avenue (the "H block area"), as being primarily residential in nature with multi-unit dwellings. He described another area, Mission Hill, as residential but having a much greater mix demographically. Stallings also noted that there are sections of Roxbury that arc commercial in nature , such as the area of Massachusetts Avenue just off Route 93.
Mr. Stark acknowledged that individuals passing through Roxbury would tend to travel on major thoroughfares while the driving population on side streets would tend to be residents of Roxbury. No attempt was made to account for these differences in analyzing the FIO stops here. Sec Ex. 5, Pascal, supra at *17; Ex. 6, Andrade, supra at *8 (discussing Mr. Stark's failure to consider "relevant roadways" in constructing an estimated driving population).
 
                                                            -15-
 
satisfies gatekeeper reliability). The court, therefore, does not credit Mr. Stark's benchmark data as it relates to the estimated percentage of African American drivers on the roadways of Roxbury at any given time during a day.
            That does not end the court's analysis, however. While the court heard no testimony regarding the demographics of the residential population of Roxbury, Table I of Mr. Stark's report nevertheless reflects that 61 percent of Roxbury's residents are Black. Sec Ex. 28 at *5. Mr. Stark arrived at this calculation by examining data from various sources, including Boston city publications, the United States Census, and other sources of information. The Commonwealth does not challenge Mr. Stark's calculation in this regard. Consequently, the court finds as an undisputed fact in this case that African Americans comprise 61 percent of Roxbury's residential population.
            For purposes of this motion, the court further assumes without deciding that 83 percent of the individuals stopped by Starkey and Stallings were Black. Thus, a statistical disparity exists between the percentage of Black residents in Roxbury (61 percent) and the percentage of Black people stopped by Starkey and Stallings (83 percent). Consequently, the court critically assesses the testimony of the police officer witnesses with respect to the remaining nonexclusive Long factors.
            (2) The Remaining Long Factors.
            Under the equal protection analysis in this case, the test is not whether a reasonable officer would have conducted a traffic stop for excessively tinted windows, speeding, and failing to stop; rather, "[t]he Long test looks to the 'true' or 'subjective' motivations of the officer at the time of the stop." Stroman, 103 Mass. App. Ct. at 129 (citation omitted).  See Long, 485 Mass. at 727 (for driver to prevail on equal protection claim there must necessarily be finding that
 
                                                            -16-
 
officer was racially biased). However, "[b]ecause implicit bias may lead an officer to make race- based traffic stops without conscious awareness of having done so ... a simple denial [that a stop was due to defendant's race] is insufficient to rebut the reasonable inference." Long, 485 Mass. at 734.
            Here, YVSF officers were performing their regular duties in patrolling the "Mass and Cass" area, which had experienced a significant increase in illicit drug use and distribution at the time of the stop. Stallings noted that, in his experience, firearms are commonly associated with illegal drug distribution. See Commonwealth v. Evelyn, 485 Mass. 691, 709 (2020) (court should consider this factor only if "high crime" nature of the area has a direct connection with the specific location and activity being investigated). It was not unusual for Stallings and other YVSF members to stop ten or more motorists each day for violations of motor vehicle laws.[11] While driving along Massachusetts Avenue, Stallings saw the Chevy and noted it was "very apparent" that the car had excessively tinted side windows. He estimated the visible light transmittance of the vehicle's side windows to be 5 percent - well below the legal limit of 35 percent. "[T]he standard to be used in determining the legality of a stop based on a suspected violation of c. 90, § 90 [prohibiting excessively tinted car windows], is whether the officer reasonably suspected, based on his visual observations, that the tinting of the windows exceeded the permissible limits of§ 90." Commonwealth v. Baez, 47 Mass. App. Ct. 115, 118 (1999). Before initiating the stop, Stallings also observed the Chevy accelerating at a high rate of speed on Theodore Glynn Way and taking a left onto Southampton Street. Police, therefore, observed
 
--------------------------------------------
 
[11] The vast majority of these stops end with verbal warnings because, in Stallings's view, fining someone for a motor vehicle violation after they have been stopped is not productive, particularly if the stop involved defective equipment for which a monetary penalty would simply add to the cost of having to make the repair to the vehicle. Stallings also noted that completing the paperwork associated with citing an operator for a civil motor vehicle infraction takes time away from his duties as a member of the YVSF.
 
                                                            -17-
 
the operator of the Chevy committing at least two violations of the automobile laws: speeding and having excessive window tint on the Chevy.[12]
            By the time officers caught up to the Chevy turning into the parking lot of a Mobil gas station, Stallings had activated the emergency lights and siren on his unmarked cruiser. Because of the excessive window tint, Stallings could neither see into the vehicle nor could he see the race of the driver or how many occupants there were in the car at the time he initiated the stop.[13]
            Rather than stop for police, Skelton sped from the area. While operating a vehicle with excessively tinted windows does not necessarily present a safety risk to the public, operating a vehicle at an excessive speed in a densely populated area does. This is reflected in BPD policies and procedures, which emphasize speeding as high priority for traffic enforcement. See Ex. 29 (BPD Rule 314, § 5).
            The evidence introduced during the hearing corroborates Stallings's testimony that race played no part in the decision to stop the defendant. First, the photographs of the Chevy show the driver and passenger side windows of the vehicle having excessively darkened tint as well as darkened tint on the rear window. Second, Holt and Soto observed the Chevy traveling at a high rate of speed on different roadways in Roxbury independent from Stallings and the other officers who initiated the stop. Third, during radio chatter regarding the pursuit of the Chevy, Starkey queried whether anyone had a description of the driver.[14] Starkey was one of the officers
 
--------------------------------------------
 
[12] The vehicle also had no license plate attached to its front. See G.L. c. 90, § 23 (failing to attach license plate to motor vehicle). However, it is unclear when that observation was made. Stallings testified that he did not take no te of the Chevy having no front plate during the pursuit, but he also stated that Starkey and Alldredge were the "eyes" during patrol of the area while he drove the unmarked SUV.
[13] Stallings also noted that excessive window tint is a concern to him because, in his experience, it has been associated with many shootings and is used to conceal the identity of the person(s) seated in the car.
[14] While this radio broadcast docs not entirely exclude the possibility that Starkey, Stallings , or Alldredge saw the race of the driver, it was made in real time while events were rapidly unfolding, and it docs tend to corroborate Stallings's testimony that he and his partners could not sec into the vehicle.
 
                                                            -18-
 
involved in the initiation of the stop. Soto, who did not initiate the stop, provided the description. Finally, it was Holt who identified Skelton as the operator of the Chevy, not Stallings , Starkey or Alldredge. Holt had observed Skelton through the Chevy's front windshield, which had no tint, after nearly colliding with the Chevy. Considering the totality of the circumstances, the court is satisfied that the decision to initiate the stop of Skelton was not motivated in part on race.
B.        FOURTH AMENDMENT/ ARTICLE 14 CHALLENGE
            1.         The stop of the Chevy occurred when police activated the emergency lights and siren on their unmarked vehicle to pull the Chevy over. Commonwealth v. Daveiga, 489 Mass. 342, 349 (2022). A police officer may conduct a traffic stop under Federal and State constitutions where probable cause or reasonable suspicion exists to believe that a motor vehicle violation was committed. Commonwealth v. Lek, 99 Mass. App. Ct. 199, 203 (2021). See also Commonwealth v. Buckley, 478 Mass. 861, 866 (2018) (the SJC "ha[s] long held that an observed traffic violation is one such [legal] justification [for a traffic stop under Article 14))." The stop of the Chevy for the civil infractions of having excessively tinted windows and speeding was lawful at its inception. See G.L. c. 90, § 9D (prohibits excessively tinted car windows, as defined therein); G.L. c. 90, §§ 17C, 20 (authorizing cities and towns to set speed limit).
2.         After hearing the radio transmissions and making his observations, Soto had reasonable suspicion, if not probable cause, to believe the defendant was the operator of the Chevy that had failed to stop for police and led other officers on a high-speed chase in a densely populated urban area. See Commonwealth v. Privette, 491 Mass. 501, 507 (2023), citing Gomes, 453 Mass. at 511 (reasonable suspicion "must be based on specific and
 
                                                            -19-
 
articulable facts, and reasonable inferences therefrom, in light of the officer's experience."); Commonwealth v. Maria, 97 Mass. App. Ct. 490, 494 (2020) ("[p]robable cause exists when police know of 'enough facts and circumstances to warrant a person of reasonable caution in believing that the defendant had committed or was committing a crime.'") (internal citations omitted). Officers found the defendant hiding beneath stairs in a backyard after he had entered a resident's apartment without permission, and Holt positively identified Skelton as the operator of the Chevy.
3.         The arrest of Skelton was lawful. Police had probable cause to believe the defendant committed several crimes, including the criminal misdemeanor offenses of trespassing (G.L. c. 266, § 120) and operating a vehicle recklessly or negligently so as to endanger the lives and safety of the public, including when he drove in the wrong direction up two one-way streets in a densely populated area at a high rate of speed (G.L. c. 90, § 24(2)(a)).
4.         After apprehending Skelton and identifying him as the operator of the vehicle, police lawfully stood outside the Chevy on a public way and took photographs of the car, including its interior. Soto returned to the vehicle and observed in plain view a clear plastic bag containing a white powder that appeared to be narcotics on the driver's seat. Upon making these documented observations, police could lawfully seize the contraband. Sec Commonwealth v. Tyree, 455 Mass. 676, 694(2010) (under plain view doctrine, '" if police are lawfully in a position from which they view an object, if its incriminating
 
                                                            -20-
 
character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant"').
5.         '"Under the automobile exception, a warrantless search of an automobile is permitted when police have "probable cause to believe that a motor vehicle on a public way contains contraband or evidence of a crime, and exigent circumstances make obtaining a warrant impracticable.""' Commonwealth v. Sheridan, 470 Mass. 752, 756 (2015) (citation omitted). "Due to the inherent mobility of an automobile, and the owner's reduced expectation of privacy when stopped on a public road, police are permitted to search a vehicle based upon probable cause to believe that it contains evidence of a crime." Commonwealth v. Davis, 481 Mass. 210,220 (2019) (citation omitted). See also Sheridan, 470 Mass. at 756 (discussing automobile exception to warrant requirement). Here, upon seeing narcotics in plain view on the driver's seat of the Chevy parked on a public roadway, police had probable cause to search the vehicle and seize the contraband located on the passenger floor of the vehicle. Obtaining a warrant to do so beforehand was impractical.
ORDER
            For the reasons set forth above, the Defendant's Motions to Suppress Evidence Under Long (Paper No. 33) and Supplemental Motion to Suppress (Paper No. 34) are DENIED. [15]

--------------------------------------------
 
[15] Skelton also requests, in general terms, suppression of evidence under the Fifth and Fourteenth Amendments to the United States Constitution and arts. 1, 10, and 12 of the Massachusetts Declaration of Rights. No statements of the defendant have been identified as the subject of the suppression motion nor does Skelton articulate the basis for suppressing any evidence under these provisions of the federal and state constitutions. Consequently, any argument along this vein is deemed waived. Sec Mass. R. Crim. P. l 3(a)(2).